IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TRISHA WAKAT, *ET AL.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-0978 |
| | § | |
| MONTGOMERY COUNTY, *ET AL.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Trisha Wakat, as administrator of the Estate of James Henry Mitchell; Kathy Gutierrez, as next friend of A.M., minor child; and Sharon Patrick, as next friend of J.M. and S.M., minor children, bring this action against Montgomery County, Texas; the Montgomery County Sheriff's Department; Guy Lynn Williams, as the former sheriff of Montgomery County; Unal Kadri Gurol, M.D., individually and as the medical director and physician for the inmates of Montgomery County, Texas Jail; Thomas Wayne Gage, as the current sheriff of Montgomery County, Texas; Tri-County Mental Health Mental Retardation; John Does #1-10; and Jane Does #1-10. Plaintiffs bring suit pursuant to 42 U.S.C. § 1983 for violations of rights guaranteed by the United States Constitution and under Texas state law as the survivors of and for the wrongful death of James Henry Mitchell. Pending before the court are the following:

  (1)   Defendant Gurol's motion for summary judgment (Dkt. 94);

  (2)   Defendant Gurol's motion to exclude the testimony of plaintiffs' pathology expert witness on causation (Dkt. 95);

  (3)   Defendant Gurol's motion to exclude or limit the testimony of plaintiffs' expert witness, Lawrence Mendel, D.O. (Dkt. 96);

  (4)   Defendant Gurol's motion to exclude causation testimony of plaintiffs' non-pathology expert witnesses (Dkt. 97);

(5)  Defendants' motion for summary judgment, filed by all defendants other than defendant Gurol (Dkt. 99); defendants' memorandum of law in support of the motion for summary judgment (Dkt 100);

(6)  Plaintiffs' response to the motions for summary judgment (Dkt. 111), with supporting affidavit (Dkt. 112) and appendices (Dkts. 113-117); defendant Gurol's reply to the response (Dkt. 119); and defendants' reply to the response (Dkt. 120); and

(7)  Plaintiffs' motion for oral hearing (Dkt. 118).

For the reasons explained below, defendant Gurol's motions to exclude or limit expert testimony will be DENIED as moot; defendant Gurol's motion for summary judgment will be GRANTED; the defendants' motion for summary judgment will be GRANTED; and plaintiffs' motion for oral hearing will be DENIED. The plaintiffs' state law claims will be DISMISSED without prejudice to refiling in a state court of appropriate jurisdiction.

## I.  FACTUAL BACKGROUND AND CLAIMS

Although the import of the facts differs, the actual sequence of events is consistent among the parties.

**1.  March 13 to 17, 2003**

According to the probative summary judgment evidence and record, James Henry Mitchell was arrested[1] in Montgomery County, Texas, on March 13, 2003, and taken to the Montgomery County Jail. Dkt. 99, Ex. A at 8. Upon arrival at the jail, Mitchell was given an inmate medical and suicide screen, and his blood pressure was reported as 128/89 with a heart rate of 115. *Id.*; Dkt. 113, Ex. 2. Two days later, Mitchell was given an additional medical screening by medical staff member

---

[1] Mitchell was arrested pursuant to a parole warrant or "blue warrant." Dkt. 99, Ex. A at 8. Generally, blue warrants are issued by the Parole Division of the Texas Board of Pardons and Paroles when there is probable cause to believe a violation of parole conditions has occurred. Texas Board of Pardons and Paroles, Parole Revocation Process, *at* http://www.tdcj.state.tx.us/bpp/revocation/revocation.html#Parole%20Revocation%20Process (last visited Jan. 11, 2006).

2

Dennis, including blood pressure and heart rate readings. Dkt. 99, Ex. A at 266-67. Mitchell provided a "nonspecific" history of heart disease and hepatitis B and C and a recent motor vehicle accident. *Id.* He reported his current medications as naproxen, nitroglycerin, Xanax, Soma, and Vicodin. *Id.* Mitchell was allowed to keep the nitroglycerin bottle on his person, and medical staff continued his naproxen medication. *Id.* Jail records show that Mitchell was given two doses of naproxen on March 17, 2003. *Id.*

**2.     March 18, 2003**

On March 18, 2003, a jail detention officer reported to medical staff that Mitchell was acting "weird." *Id.* at 270. Medical officer Dennis examined Mitchell and checked his vital signs. *Id.* His blood pressure was reported as 145/89 with a heart rate of 116. *Id.* Mitchell was reported as alert and oriented, but was conversing with individuals who were not there. *Id.* He denied alcohol abuse, but admitted to using narcotics. *Id.* Dennis placed Mitchell on regular blood pressure checks[2] and returned him to his cell. *Id.*

That same evening, Mitchell's boss called the jail, because in a phone call earlier that day, Mitchell told his boss he was beaten and shocked by guards. *Id.* at 143. Corporal Cotton and Detention Officer Richards immediately investigated the report and found Mitchell to be disoriented and confused. *Id.* They then moved Mitchell to the observation area and notified Medic Stanley. *Id.*

**3.     March 19, 2003**

The following morning, March 19, detention officers found Mitchell lying on top of the shower stall and experiencing what they described as DT's. Dkt. 99, Ex. A; Dkt. 113, Ex. 20. They

---

[2] The plaintiffs contend and the record does not show that those blood pressure checks were ever performed.

notified a medic and moved Mitchell to restraint room B. *Id.* Restraint rooms are padded cells with no fixtures except a grate in the floor. Dkt. 113, Ex. 13 at 41. After Medic Stanley interviewed Mitchell, Stanley notified Dr. Gurol that Mitchell seemed to be going through DT's. Dkt. 99, Ex. A at 270. Dr. Gurol ordered that Mitchell be started on Mellaril, an anti-psychotic. Dkt. 113, Ex. 9 at 163. Additionally, Stanley made an appointment for Dr. Gurol to evaluate Mitchell the following day. Dkt. 99, Ex. A, Dkt. 113, Ex. 1 at 4-5. A few hours later, Mitchell was moved to restraint room A, because he had pulled the metal grate out of the floor drain in restraint room B. Dkt. 99, Ex. A; Dkt. 113, Ex. 20.

**4.     March 20, 2003**

Early in the morning of March 20, entries in the log stated that Mitchell was "detoxing bad." Dkt. 113, Ex. 20. However, later that morning he walked under his own power to his appointment with Dr. Gurol. Dkt. 113, Ex. 9 at 119-125. Dr. Gurol observed that Mitchell had fine tremors and slightly bulging eyes. *Id.*; Dkt. 99, Ex. A at 270-72. Although there is no record that Mitchell's vital signs were checked, Dr. Gurol stated in his deposition that he never saw patients without having their vital signs checked. Dkt. 113, Ex. 9 at 119-125. But, neither the jail's records nor the records of the LVN attending the exam noted any vital signs. *Id.* Additionally, during the exam Mitchell told Dr. Gurol that "I'm not really here right now, they killed me last night. I was shot in the head 3 times and then they poured gasoline on me and set me on fire." Dkt. 99, Exs. A & D. Concluding that Mitchell had undifferentiated schizophrenia, Dr. Gurol increased the dosage of the Mellaril, ordered a psychological exam from Tri-County, and prescribed Cogentin to counteract any side effects from the Mellaril. Dkt. 113, Ex. 9 at 145; Dkt. 99, Ex. A at 270-72. During the exam Dr. Gurol saw no signs of withdrawals from alcohol or benzodiazepine. Dkt. 113, Ex. 9 at 172. Dr. Gurol also made an appointment to see Mitchell again in ten days time. Dkt. 99, Exs. A at 272. When Medic

4

Longdon contacted Tri-County MHMR to schedule the psychological exam, they refused to see Mitchell, because Dr. Gurol had already prescribed Mellaril, an anti-psychotic. *Id.*

5.    **March 21 and 22, 2003**

Mitchell remained in the restraint room during the day on March 21. Dkt. 113, Ex. 20. That evening detention personnel found Mitchell lying on the floor in his own waste going through what they described as DT's. Dkt. 99, Ex. A. They alerted the medic who then administered Mitchell's medication and fed him a sack lunch. *Id.* They then placed Mitchell in the restraint chair. *Id.* The restraint chair is a chair on wheels with straps to restrain an inmate's arms and legs. Dkt. 113, Ex. 23. The County has a policy that inmates should not be left in the chair for more than 2 hours at a time. *Id.* At some later point while Mitchell was in the restraint chair, pursuant to jail policy, they began to video tape him. Dkt. 113, Ex. 19. Finally, at approximately 3 a.m. on March 22, they removed Mitchell from the restraint chair and returned him to restraint room A. *Id.* During the day on March 22, Medics Forey and Stanley checked on Mitchell regularly and dispensed his approved medications. Dkt. 99, Ex. A. Although they described Mitchell as detoxing, they also stated that he was able to sit up and speak coherently. *Id.* That afternoon, family members were turned away when they came to visit Mitchell. Dkt. 113, Ex. 20. Sergeant Quertermous explained to them that they could not see Mitchell because he was detoxing. *Id.*

6.    **March 23, 2003**

At approximately noon on March 23, Medic Forey was concerned enough about Mitchell's lack of progress that he called Dr. Gurol. Dkt. 113, Ex. 41 at 222. He described Mitchell as still detoxing and not getting any better. *Id.* At this point, Dr. Gurol decided that Mitchell was experiencing late stage DT's and prescribed Ativan injections for Mitchell's withdrawal symptoms and an IV for his dehydration. Dkt. 113, Ex. 9 at 174-77. Additionally, the medics administered Vitamin B-1 pursuant to Dr. Gurol's standing order for treatment of DT's. Dkt. 99, Ex. A. That

afternoon Mitchell's mother attempted to visit him in jail, but she was turned away. Dkt. 113, Ex. 20 at 15. County personnel told her that Mitchell was too unstable to visit that day, but should be better by the following weekend. *Id.* At 4:00 p.m. the medics administered the Ativan shot prescribed four hours earlier by Dr. Gurol. Dkt. 113, Ex. 41. Later, at 6:10 p.m., Medics Gagliano and Forey found Mitchell lying prone on the floor of the restraint room, his underwear soaked with urine. *Id.* They transported Mitchell, now too weak to walk, to the infirmary, cleaned him, and put a diaper on him. Dkt. 113, Ex. 20. Although Medic Forey attempted to take Mitchell's blood pressure, Mitchell would not hold still long enough for Forey to get a reading. Dkt. 113, Ex. 11 at 108. Additionally, since Mitchell was attempting to remove his I.V., the medics put him in soft restraints. *Id.* Medic Gagliano reported that Mitchell knew his own name and responded to it when asked. *Id.* The medics again administered Ativan at 10:00 p.m. and continued to monitor Mitchell throughout the night and into the morning of the 24th. Dkt. 113, Ex. 41 at 222.

**7.     March 24, 2003**

At approximately 5:40 a.m. on March 24, Medic Gagliano administered Ativan and changed Mitchell's I.V. bag. Dkt. 99, Ex. A. Fifteen minutes later, Gagliano observed that Mitchell had vomited blood the color of coffee grounds and was not breathing. *Id.* Gagliano immediately called a "Sergeant Blue"[3] and requested assistance from the Fire Department and the County Hospital E.M.T.s. *Id.* at 26. At 6:01 a.m., the E.M.T.s arrived on the scene and took over attempts to resuscitate Mitchell. *Id.* However, the attempts were unsuccessful and at 6:08 a.m. the supervising paramedic pronounced Mitchell dead. *Id.* Later autopsy results list Mitchell's cause of death as atherosclerotic cardiovascular disease with chronic Hepatitis as a contributing factor. *Id.* at 58.

---

[3] "Sergeant Blue" indicates a medical emergency in the infirmary. Dkt. 99, Ex. A at 26.

## II. STANDARD OF REVIEW

Summary judgment should be granted if the record, taken as a whole, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED. R. CIV. P. 56(c); *New York Life Ins. Co. v. Travelers Ins. Co.*, 92 F.3d 336, 338 (5th Cir. 1996). The Supreme Court has interpreted the plain language of Rule 56(c) to mandate "the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (quoting *Celotex*, 477 U.S. at 323-25). If the moving party "fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." *Little*, 37 F.3d at 1075.

If the moving party meets this burden, Rule 56(c) requires the nonmovant to go beyond the pleadings and show by affidavits, depositions, answers to interrogatories, admissions on file, or other admissible evidence that specific facts exist over which there is a genuine issue for trial. *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1046-47 (5th Cir.1996). The nonmovant's burden may not be satisfied by conclusory allegations, unsubstantiated assertions, metaphysical doubt as to the facts, or a scintilla of evidence. *Little*, 37 F.3d at 1075; *Wallace*, 80 F.3d at 1047. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Wallace*, 80 F.3d at 1048 (quoting *Little*, 37 F.3d at 1075). *See also S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 494 (5th Cir.1996). The court will not, "in the absence of any proof, assume that the nonmoving party could

or would prove the necessary facts." *McCallum Highlands v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir.1995), as revised on denial of rehearing, 70 F.3d 26 (5th Cir.1995). Unless there is sufficient evidence for a jury to return a verdict in the nonmovant's favor, there is no genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-51, 106 S.Ct. 2505 (1986).

In order to determine whether or not summary judgment should be granted, an examination of the substantive law is essential. Substantive law will identify which facts are material in that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*, 477 U.S. at 248.

### III. SECTION 1983

Section 1983 creates a cause of action versus "[e]very person who, under color of any statute ⋯ of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution . . . ." 42 U.S.C. §1983. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161, 112 S.Ct. 1827 (1992) (citing *Carey v. Piphus*, 435 U.S. 247, 254-257, 98 S.Ct. 1042 (1978)). Here the plaintiffs claim a deprivation of rights guaranteed by the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

1.  **Fourth Amendment**

The plaintiffs' first amended complaint alleges that the defendants violated Mitchell's Fourth Amendment rights. The defendants argue that the court should grant their motion for summary judgment on this issue because the plaintiffs may not claim a Fourth Amendment violation. In order to show a Fourth Amendment violation, the plaintiffs must allege misconduct during Mitchell's arrest. The defense claims that the plaintiffs have neither pleaded nor adduced any facts regarding

Mitchell's arrest. The court agrees. "Fourth Amendment claims are appropriate [only] when the complaint contests the method or basis of the arrest and seizure of the person." *Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000) (quoting *Brooks v. George County*, 84 F.3d 157, 166 (5th Cir.1996)). The record is completely devoid of allegations concerning wrongdoings before Mitchell was booked into the Montgomery County Jail. Tellingly, the plaintiffs never argue the validity of the blue warrant. In fact, they describe Mitchell's arrest by simply stating that the arresting deputy "was obliged to arrest Mitchell" when "[t]he computer check turned up a blue warrant." Dkt. 111, at 2. Even had the plaintiffs argued that excessive force was used on Mitchell during his incarceration, which they do not, the Fourth Amendment would still not be the proper avenue for relief. The Fifth Circuit has clearly stated that the Fourth Amendment is not the correct basis for a constitutional challenge to "deliberate official uses of force occurring, as in this case, after the incidents of arrest are completed, after the plaintiff has been released from the arresting officer's custody, and after the plaintiff has been in detention . . . for a significant period of time." *Valencia v. Wiggins*, 981 F.2d 1440, 1443-44 (5th Cir. 1993). Therefore, the plaintiffs may not recover, as a matter of law, on their Fourth Amendment claim.

**2.      Fifth Amendment**

In addition to their Fourth Amendment claims, the plaintiffs allege that Mitchell's Fifth Amendment rights were violated by the defendants. The defendants argue that, as a matter of law, Fifth Amendment claims may not be brought against the county. The court agrees. "The Fifth Amendment applies only to violations of constitutional rights by the United States or a federal actor." *Jones*, 203 F.3d at 880. The plaintiffs make no argument that the defendants "were acting under authority of the federal government." *Id.* And, the record shows no hint of federal

9

involvement. Accordingly, the plaintiffs may not recover, as a matter of law, on their claim under the Fifth Amendment.

**3.      Fourteenth Amendment**

The plaintiffs also claim that the defendants violated Mitchell's Fourteenth Amendment rights. As with their Fourth and Fifth Amendment claims, the plaintiffs do not give the court any guidance as to which acts by the defendants give rise to a Fourteenth Amendment claim. However, an examination of the plaintiffs' complaint and response to the defendants' motion for summary judgment suggests that the Fourteenth Amendment violation they claim, if any, is a due process claim that the defendants violated Mitchell's bodily integrity. Defendants argue that the Fourteenth Amendment is the improper vehicle for this type of claim. They are correct. Mitchell was arrested on a parole warrant or "blue warrant" for a possible violation of parole conditions. Dkt. 99, Ex. A at 8. Parolees who are detained for a violation of parole are considered convicted prisoners rather than pre-trail detainees. *Rankin v. Klevenhagen*, 5. F3d 103, 106 (5th Cir. 1993). The rights of a pre-trial detainee are protected under the Fourteenth Amendment while those of a convicted prisoner fall under the Eighth Amendment's prohibition against cruel and unusual punishment. *Id.*; *Valencia v. Wiggins*, 981 F.2d 1440, 1445 (5th Cir. 1993) (citing *Ingraham v. Wright*, 430 U.S. 651, 671 n. 40, 97 S.Ct. 1401 (1977)). The Eighth Amendment, not the Fourteenth Amendment, "serves as the primary source of substantive protection to convicted prisoners." *Austin v. Johnson*, 328 F.3d 204, 210 n.10 (5th Cir. 2003) (quoting *Whitley v. Albers*, 475 U.S. 312, 327, 106 S.Ct. 1078 (1986)). When, as here, both the Eighth Amendment and the due process clause of the Fourteenth Amendment serve to protect the same constitutional right, then the claim must be brought under the more specific source of protection rather than as a generalized substantive due process claim. *Austin*, 328 F.3d at 210 (citing *Graham v. Connor*, 490 U.S. 386,

395, 97 S.Ct. 285 (1976)). *Accord Calhoun v. Hargrove*, 312 F.3d 730, 735 (5th Cir. 2002) (finding that a Fourteenth Amendment claim for inadequate medical care was "really a restatement of [an] Eighth Amendment claim [and] must be analyzed under the standard appropriate to that specific provision."). Accordingly, plaintiffs' Fourteenth Amendment claim fails as a matter of law.

**4.    Eighth Amendment**

The plaintiffs claim that the county and its employees' willful neglect in the face of Mitchell's ever-worsening health violated Mitchell's Eighth Amendment rights. "The Eighth Amendment prohibition against cruel and unusual punishment forbids deliberate indifference to the serious medical needs of prisoners." *Lawson v. Dallas County*, 286 F.3d 257, 262 (5th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285 (1976)). Since the standard of review differs depending on the status of the defendant, the court will review each defendant in turn. *See id.* at 264 (explaining the difference between individual and municipal liability); *Hafer v. Melo*, 502 U.S. 21, 25-28, 112 S.Ct. 358 (1991) (reiterating the distinction between individual capacity suits and official capacity suits).

   A.    Guy Lynn Williams

Plaintiffs sue Williams in his official capacity as sheriff of Montgomery County, Texas. Plaintiffs assert that Williams was responsible for establishing, or failing to establish, policies, practices, procedures, and regulations for conduct of the sheriff's department and its employees. Plaintiffs further claim that Williams was responsible for the training and supervision of department employees, and was the policy-making official as to law enforcement and operations of the Montgomery County Jail. The defendants argue that Williams is not a proper defendant in this action and all claims against him should be dismissed. They urge that suits against officials in their official capacity are no different from suits against the county and are therefore duplicative. The

11

plaintiffs have not responded to this argument. Regardless of the duplicative nature of naming Williams, the suit may not be maintained against him in his official capacity because he is no longer the sheriff of Montgomery County. The Federal Rules of Civil Procedure specify that "[w]hen a public officer is a party to an action in his official capacity and during its pendency . . . ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party." FED. R. CIV. P. 25(d)(1). *See also Kentucky v. Graham*, 473 U.S. 159, 166 n. 11, 105 S.Ct. 3099 (1985) (citing Rule 25(d)(1) to explain why official capacity damages cannot be executed against an individual). Since the plaintiffs specifically named Williams as a defendant in his official capacity, he ceased to be a defendant the moment he ceased to be sheriff. Accordingly, the plaintiffs' claims against him fail as a matter of law.

    B.    <u>Thomas Wayne Gage</u>

Plaintiffs do not specify whether they are suing Gage in his official capacity as sheriff or in his individual capacity. The defendants argue that any claim against Gage must be in his official capacity because neither the law nor the facts will support an individual capacity suit. Additionally, they argue, as with Williams, an official capacity suit is duplicative since the county is already named as a defendant. Again the plaintiffs make no response to this argument. The Supreme Court states that when the complaint is not specific, the court should look to the course of proceedings to determine in which capacity the official is sued. *Graham*, 473 U.S. at 167. A review of the facts demonstrates that the plaintiffs cannot sue Gage in his individual capacity, because he was not the sheriff at the time the events at issue took place. No evidence has been adduced to show he participated in any of the alleged activities in any individual capacity. As such he cannot have individual culpability. Therefore, the plaintiffs must be suing him in his official capacity. However, since the plaintiffs have also named Montgomery County as a party to the suit, naming Gage in his

official capacity is redundant. *Hafer*, 502 U.S. at 25 ("Suits against state officials in their official capacity therefore should be treated as suits against the State."). Accordingly, the plaintiffs' claims against Gage are dismissed because they are coterminous with the claims against the county.

    C.    <u>Montgomery County Sheriff's Department</u>

Plaintiff claims that the Montgomery County Sheriff's Department ("MCSD") is liable under § 1983 because it is responsible for furnishing a safe and suitable jail facility. Defendants argue that the MCSD is not a separate entity from the County and therefore lacks the capacity to be sued. Plaintiffs do not respond to this argument. "[A] political subdivision cannot pursue a suit on its own unless it is 'a separate and distinct corporate entity.'" *Darby v. Pasadena Police Dept.*, 939 F.2d 311, 313 (5th Cir. 1991) (quoting *Kirby Lumber Corp. v. State of La. through Anacoco-Prairie State Game and Fish Comm'n*, 293 F.2d 82, 83 (5th Cir. 1961)). Fifth Circuit "cases uniformly show that unless the true political entity has taken explicit steps to grant the servient agency with jural authority, the agency cannot engage in any litigation except in concert with the government itself." *Id.* The plaintiffs have not demonstrated that the MCSD has been granted such authority by Montgomery County. Accordingly, the MCSD is not a proper defendant and the plaintiffs cannot maintain claims against it as a separate entity.

    D.    <u>Montgomery County, Texas</u>

Plaintiffs allege that Montgomery County is responsible for the policies, practices, procedures, regulations, and customs of its sheriff's department and the Montgomery County Jail. They allege, among other things, that the County (1) failed to provide proper care to Mitchell; (2) punished Mitchell by placing him in a padded cell; (3) failed to hire, train, supervise, and monitor its staff in the care of inmates suffering from medical, emotional, and psychological problems including how to deal with internal bleeding, how to revive inmates in an emergency, and when to

13

transport inmates to a medical facility; and (4) failed to maintain adequate records regarding the observation of Mitchell during his illness. The defendants argue that the plaintiffs' claims against the County must fail because Mitchell suffered no deprivation of a constitutional right, the County had no unconstitutional policy or custom, there was no inadequate training of County personnel, and the County did not act with deliberate indifference to a known risk. The plaintiffs counter that the record shows ample evidence that the County had an unconstitutional policy of removing inmates "cold turkey" from narcotic drugs commonly known to produce severe withdrawal symptoms. Further the plaintiffs claim the record demonstrates that the County acted with deliberate indifference to Mitchell's serious medical needs. The court disagrees. A municipality will only be liable under § 1983 if it had an official policy which directly caused the constitutional violation at issue. *Lawson*, 286 F.3d at 263. Additionally, the municipality must have maintained that policy with deliberate indifference to the constitutionally protected right. *Id.* Therefore, if the County can demonstrate that it is entitled to summary judgment on any part of these requirements, the plaintiffs' § 1983 claims must fail.

The plaintiffs cannot show that the County policy directly caused Mitchell's injury. Section 1983 mandates that the official <u>policy</u> must have <u>caused</u> an <u>employee</u> to violate Mitchell's rights. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 n. 16 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018 (1978)). Here, the plaintiffs claim that the jail has a written policy of abruptly discontinuing any narcotic medications when inmates are initially processed for booking regardless of whether the inmate had a valid prescription for the narcotic. The jail does indeed have such a policy. Dkt. 113, Ex. 26. However, the jail also has a policy allowing the narcotic medications to be reinstated with the permission of a doctor. County personnel have a grace period of 48 to 72 hours to reinstate any narcotic medications. *Id.* The fact that jail personnel

did not follow up on Mitchell's prescription for Xanax may have been negligence on their part, but that is not enough to support an Eighth Amendment claim. *Lawson*, 286 F.3d at 262; *Hare v. City of Corinth*, 74 F.3d 633, 649 (5th Cir. 1996). "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski*, 237 F.3d at 578. A municipality may not be held liable under a *respondeat superior* theory. *Id.* Because the County policy did not directly cause the County personnel to fail to seek physician approval to reinitiate Mitchell's prescriptions, the County cannot be liable under § 1983 for failure to provide adequate medical care.

The plaintiffs' claims against the County for a failure to adequately train or supervise must similarly fail. "[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382 (1997). "A showing of simple or even heightened negligence will not suffice." *Id.* This type of deliberate indifference is especially difficult to demonstrate. *Piotrowski*, 237 F.3d at 579. One possible way the plaintiffs could demonstrate deliberate indifference is to demonstrate "a pattern of tortious conduct by inadequately trained employees [showing] that the lack of proper training, rather than a one-time negligent administration of the program or factors peculiar to the officer involved in a particular incident, is the 'moving force' behind the plaintiff's injury." *Brown*, 520 U.S. at 407-08. Alternatively, the plaintiffs can show an obvious need for training due to a clear constitutional duty in a usual and recurring situation. *City of Canton v. Harris*, 489 U.S. 378, 394-95, 109 S.Ct. 1197 (1989) (O'Connor, J., concurring). The plaintiffs have made no effort to adduce any evidence of a

15

pattern or a recurring situation. In fact, the depositions show that the injury here—the death of Mitchell by a heart attack brought on by "DT's"—is the only death at the Montgomery County Jail for the last four years. Dkt. 113, Ex. 9 at 117. Therefore, they cannot meet the heightened deliberate indifference standard for a failure to train or supervise claim. Accordingly, the plaintiffs' § 1983 claims against the County fail as a matter of law.

### E. Unal Kadri Gurol, M.D.

Plaintiffs sue Gurol in his capacity as the medical director and physician of the medical division for the Montgomery County Jail. They assert that Gurol provides contractual medical services for inmates in the custody of the Montgomery County Jail. As the medical director of the jail's infirmary and the person who diagnosed and treated Mitchell, the plaintiffs' claims for constitutional violations center, in large part, around Gurol. Gurol moves for summary judgment on the Eighth Amendment claims based on a wide variety of grounds. Like the County, if he can demonstrate that he is entitled to summary judgment on any of the requirements of a § 1983 Eighth Amendment claim for denial of medical treatment, the plaintiffs' claim fails as a matter of law.

In order to hold Gurol liable for a denial of medical treatment, the plaintiffs must demonstrate that (1) Mitchell was objectively exposed to a substantial risk of serious harm; (2) Dr. Gurol was actually aware of the risk; and (3) Gurol acted or failed to act with deliberate indifference. *Lawson*, 286 F.3d at 262 (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 837, 114 S.Ct. 1970 (1994)). The court need not determine whether the plaintiffs have demonstrated substantial risk and actual knowledge because the plaintiffs cannot show that Gurol acted with deliberate indifference. To show deliberate indifference, the plaintiffs must demonstrate that Gurol "refused to treat [Mitchell], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *United States v. Gonzales*,

16

436 F.3d 560, 575 (5th Cir. 2006). Deliberate indifference may not be predicated on negligence or a "failure to alleviate a risk that [Gurol] should have perceived but did not." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). *See also Farmer*, 511 U.S. at 837 (holding that negligent medical care was insufficient for an Eighth Amendment claim). Far from showing that Gurol was indifferent to Mitchell's condition, the evidence shows that he responded with the medical care he deemed appropriate each time he was alerted to Mitchell's problems. On March 19, when he was first called about Mitchell's disorientation and hallucinations, Gurol prescribed Mellaril to help with the hallucinations and made an appointment to see Mitchell the next day. Dkt. 99, Ex. A at 270-74. Gurol had his appointment with Mitchell on the morning of March 20, at which time he diagnosed Mitchell with undifferentiated schizophrenia. *Id.* In his professional opinion he saw no signs of withdrawals from benzodiazepine. Dkt. 113, Ex. 9 at 171-72. Instead, he looked at the symptomology presented to him and made a diagnosis. *Id.* The fact that his diagnosis was incorrect is tragic, but not deliberately indifferent. He did not ignore Mitchell's complaints. The plaintiffs have shown the court no evidence that Gurol intentionally treated Mitchell for undifferentiated schizophrenia while knowing that, in fact, Mitchell was suffering dangerous withdrawals from a prescription drug to which he was addicted. None of Gurol's actions show a "wanton disregard" for Mitchell's medical needs. He may have been wrong in his diagnosis, but he did diagnose. His reactions to the information he was given might have been wrong, but they were actions. "There is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help." *Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979). Because the defendants have shown, based on the summary judgment evidence, that Gurol did not act with deliberate indifference as a matter of law, the plaintiffs' § 1983 claims against him must fail as well.

F.      John Does #1-10; and Jane Does #1-10

The plaintiffs have named John Does #1-10 and Jane Does #1-10 as defendants to the suit. Since the plaintiffs have alleged no facts against these unnamed defendants and the time for discovery has long since passed, these defendants will also be dismissed.

### IV.   STATE LAW CLAIMS

Plaintiffs assert state law claims against the defendants pursuant to the Texas Tort Claims Act and for right of survivorship and wrongful death. Federal courts are courts of limited jurisdiction and adjudicate claims arising from violations of federal law including the United States Constitution, claims in which diversity of the parties is present, and pendent state law claims over which the court may exercise supplemental jurisdiction. Because the court has concluded that plaintiffs' federal claims are subject to dismissal, no federal question remains before the Court. Although this fact alone does not divest the Court of jurisdiction, the general rule in this circuit is to dismiss state law claims when the federal claims they supplement are dismissed. *Parker & Parsley Petroleum Co. v. Dresser Industries*, 972 F.2d 580, 585 (5th Cir. 1992). The dismissal of the supplemental state law claims should expressly be without prejudice so that plaintiffs may refile their claims in the appropriate state court. *Bass v. Parkwood Hosp.*, 180 F.3d 234, 246 (5th Cir. 1999). Because the court has concluded that the federal claims asserted in this action are subject to dismissal, the court declines to exercise supplemental jurisdiction over the plaintiffs' remaining state law claims. Accordingly, the court concludes that the plaintiffs' state law claim for wrongful death is subject to dismissal without prejudice to refiling in a state court of appropriate jurisdiction.

## V.  CONCLUSION

After reviewing the arguments of the parties, the summary judgment record, and the applicable law, the court finds that the defendants' motions for summary judgment as to the plaintiffs' § 1983 claims are well taken and should be GRANTED.

Accordingly, defendant Gurol's motion for summary judgment (Dkt. 94) is GRANTED with regard to the plaintiffs' § 1983 claims.

Defendants Montgomery County, Montgomery County Sheriff's Department, Guy Williams, and Thomas Gage's motion for summary judgment (Dkt. 99) is GRANTED with regard to the plaintiffs' § 1983 claims.

Plaintiffs' state law claims under Texas state law as the survivors of and for the wrongful death of James Henry Mitchell (*See* Dkt. 24) are DISMISSED without prejudice to refiling in a state court of appropriate jurisdiction.

Because the testimony of Lawrence Mendel, the plaintiffs' pathology expert, and the plaintiffs' non-pathology expert played no part in the court's decision, defendant Gurol's motions to exclude their testimony (Dkts. 95, 96 & 97) are DENIED as moot.

Plaintiffs' claims against John Does #1-10 and Jane Does #1-10 are DISMISSED without prejudice for the reasons stated above.

Plaintiffs' motion for oral hearing (Dkt. 118) is DENIED.

It is so ORDERED.

Signed at Houston, Texas, on January 12, 2007.

_____
Gray H. Miller
United States District Judge